**NATIONAL TREASURY EMPLOYEES UNION, an unincorporated association, et al., Appellants,**

v.

**Ronald W. REAGAN, individually and in his capacity as President of the United States, et al.**

**Elaine M. BOUTILIER, Appellant,**

v.

**Ronald W. REAGAN, individually and in his capacity as President of the United States, et al.**

**NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, et al., Appellants,**

v.

**Ronald W. REAGAN, individually and in his capacity as President of the United States, et al.**

**Marc R. WINE, et al., Appellants,**

v.

**Ronald W. REAGAN, President of the United States, et al.**

**Melody A. TROTT, on behalf of herself and others similarly situated, et al., Appellants,**

v.

**Ronald W. REAGAN, individually and in his capacity as President of the United States, et al.**

Nos. 81–1294 to 81–1298.

United States Court of Appeals, District of Columbia Circuit.

Argued May 20, 1981.

Decided Aug. 11, 1981.

Robert M. Tobias, Washington, D. C. (John F. Bufe, Sharyn Danch and William F. White, Washington, D. C., on brief), for appellants National Treasury Emp. Union.

Joseph B. Scott, Washington, D. C. (Irving Kator, Washington, D. C., on brief), for appellants Marc Wine and Richard Peppin et al.

Michael J. Grealy, Raymond J. Malloy, Washington, D. C., for appellants National Ass'n of Government Emp. et al.

Philip Sturman, Baltimore, Md., for appellants-intervenors Diana M. Boyd, et al.

Philip L. Chabot, Jr., and Carol MacKinnon, Washington, D. C., for appellants Melody Trott et al.

Alfred R. Mollin, Atty., U.S. Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

David C. Vladeck and Alan Morrison, Washington, D. C., were on the brief for amicus curiae Public Citizen.

Before ROBINSON, Chief Judge, and TAMM and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In these cases, we are called upon to determine the legality of the federal hiring freeze ordered by President Reagan on January 20, 1981, as it applies to those persons who had been notified between November 5, 1980, and January 20, 1981, that they had been unconditionally selected for federal jobs and who had not begun work on or by January 20, 1981. Plaintiffs raise a number

of theories under which they believe they are entitled to relief. They contend, *inter alia*, that the individual plaintiffs were irrevocably appointed to the jobs in question, that there nonemployment was a taking of property in violation of the fifth amendment, that the federal government was estopped from denying employment to them, that the President was without authority to rescind the appointment authority of the department heads, and that the freeze as applied violated the Impoundment Control Act of 1974. We address each of these claims below.

## I. CONTENTIONS RELATING TO THE APPOINTMENT PROCESS

The class of individual plaintiffs in these cases is composed of

[a]ll persons, whether currently employed by the federal government or not, who were issued written confirmation of their selection for employment with an executive branch, department or establishment of the United States between November 5, 1980, and January 20, 1981, and who were directed to report to duty on a date certain, and who, as a result of defendant Reagan's "Memorandum for the Heads of Executive Departments and Agencies" and defendant McComber's OMB Bulletin No. 81–611, were subsequently informed that the appointment was withdrawn.

Class Certification Order (Feb. 26, 1981), Joint Appendix (J.A.) at 87.[1]

The plaintiffs contend that the hiring freeze was unlawful as applied to members of the class because they had been legally and irrevocably "appointed" to the positions for which they had been selected. The district court concluded that members of the class had not been appointed, but had only

been given offers of jobs, which could be revoked.[2] We agree with plaintiffs that class members were appointed to the jobs in question; we disagree, however, as to the possibility of revocation.

For more than one hundred and seventy-five years, the rule as to when an appointment takes place has been clear: "when the last act to be done by the [appointing authority] was performed . . . ." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 156, 2 L.Ed. 60 (1803). *See, e. g., Goutos v. United States*, 552 F.2d 922, 925 (Ct.Cl.1976). Although the parties agree that this is a proper statement of the law, they differ as to its application to the facts of these cases.

We note initially that the problem before us arises only because the statutes and regulations concerning this appointment process are unclear. Congress or an executive agency it authorized could establish a process in which the point of appointment was specified, or obvious beyond dispute. *See, e. g.*, 5 U.S.C. § 3301(1) (1976). Neither has done so. Even absent statutory or regulatory clarification, the ambiguity in these cases might have been resolved had the relevant authorities included in the written notification of selection some indication that appointment itself was conditioned upon some future discretionary event. *Cf. Goutos v. United States*, 552 F.2d 922 (Ct. Cl.1976) (necessity of filling out form clear to all involved in process). Here, however, the "selection" was stated in absolute terms. In the absence of authoritative guidance, therefore, this court must proceed to determine whether appointments actually occurred.

■ What guidance there is resides in the Federal Personnel Manual (FPM or

---

1. The five cases making up this appeal were consolidated with the consent of the parties on February 16, 1981. The district court granted summary judgment for defendants by Order of February 26, 1981. 509 F.Supp. 1337. It is from this Order that appellants appeal. This court granted appellants' motion to expedite this appeal on March 19, 1981.

 The district court's class certification was expressly conditional. We agree with the district court that, as of February 16, these cases

were appropriate for class action status under Fed.R.Civ.P. 23. We leave it to the considered judgment of the district court to determine whether the issues remaining in these cases on remand of the record should be treated on a class basis.

2. *National Treasury Employees Union, et al. v. Reagan, et al.*, 509 F.Supp. 1337 (D.D.C.1981), Joint Appendix (J.A.) at 92–107.

Manual), issued by the Office of Personnel Management (OPM).[3] The Manual is "the official medium of the Commission [sic] for issuing its personnel regulations and instructions, policy statements, and related material on Government-wide personnel programs, to other agencies." Ch. 171, subch. 2–1 (January 31, 1972).[4] The Government contends that the Manual supports the conclusion that the filling out of a Standard Form 50, or the filling out of a Standard Form 52 followed by the entrance of the "selectee" onto duty, is the last act within the meaning of *Marbury*. As authority for its contention, it cites FPM Supplement 296–31, Book V, Table 3, at 26:10 (Item 34), which provides in its entirety:

| Type of Information | Item No. | Specific Instructions |
| --- | --- | --- |
| Signature (or other authentication) and title | 34 | Show signature (or other authentication) and title of appointing officer. SF 50 must be signed or authenticated on/before effective date of the action unless approval signature on SF 52 (Part II, item k) is that of the appointing officer or unless the effective date has been set by law, Executive Order, regulation, court action or by a decision of OPM, MSPB, EEOC or FLRA. |

The table of which this item is part appears under the heading of "Tables Pertaining to *Documenting* Personnel Actions." *Id.* (emphasis added). The introduction to the Supplement states that "[t]his supplement provides guidance for personnel offices in *processing* personnel actions." FPM Supplement 296–31, Introduction (emphasis added). The form itself is entitled *"Notification* of Personnel Action." FPM, ch. 296–5, subch. 2–4(a) (emphasis added). The notion that the "processing" of this Form is anything more than the ministerial act which it would appear from its placement and de-

scription in the FPM Supplement is justified only by repeated references to the document's importance. Thus, it is said that these Forms are "the basic source documents by which rights and benefits under the laws and regulations pertaining to Federal service are determined." FPM Supplement 296–31, Book V, Introduction.[5] Elsewhere it is said that:

The Commission requires the preparation of notifications of personnel actions primarily to provide basic documentation of a person's Federal employment, to notify the employee of the personnel action, and to provide basic records which will permit agencies and the Commission:

(1) To determine the status and rights of employees as well as their eligibilities for promotion, transfer, re-employment, and other personnel actions.

(2) To show whether personnel actions authorized or ordered have been effected, and whether actions effected have been authorized.

(3) To expedite the payment of retirement refunds and annuities to persons separated from the service.

FPM, ch. 296, subch. 2–1(a). These testimonials to the significance of the Forms as basic documents of one's federal employment record are irrelevant, however, to the question whether their execution is a prerequisite to appointment. The Government has cited no statute, regulation, or Personnel Manual provision to establish this point.

Once we have disagreed with the Government's characterization of provisions of the Manual as dispositive, very little remains of the Government's argument on this point. In the first place, any deference normally

**3.** The Director of the Office of Personnel Management is primarily responsible for "executing, administering, and enforcing—(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service . . . ." 5 U.S.C. § 1103(a)(5) (Supp. III 1979).

**4.** OPM succeeded the Civil Service Commission as a result of the Civil Service Reform Act of 1978, Pub.L.No. 95–454, 92 Stat. 1111 (1978). The FPM is gradually being revised to reflect the change in name.

**5.** Scrutiny of the Manual and its supplements does suggest that Forms 50 and 52 are more significant than the other forms used in processing federal personnel actions, of which there are more than *seventy-five*. *See* FPM Supplement 296–33, subch. 5, Figure 5–1: Forms Most Frequently Used in Processing Personnel Actions, at 5–5 through 5–11. FPM Supplement 296–33 supersedes Supplement 296–31. Its use is mandatory for personnel actions effective January 1, 1982, or later.

due the OPM's interpretation of its regulations, see, e. g., Odin v. United States, 656 F.2d 798 (D.C.Cir.1981), slip op. at 10–11 n.22, is undermined by the apparent inconsistency of this interpretation with previous constructions of the provision. In Foote v. Kreps, No. 79–2301 (D.D.C., filed Aug. 29, 1979), for example, the Government introduced an affidavit of William N. Turanin, Chief, Division of Career Management, Office of Personnel, Maritime Administration, in which Mr. Turanin stated that

> Mr. Foote's Cross-Motion for Summary Judgment contains erroneous statements regarding personnel forms, practices, and procedures. It wrongly states that "a personnel action . . . is not effective until the action is properly memorialized in a Standard Form 50 notification of personnel action" (Cross-Motion at 5). This is not true. The SF–50, Notification of Personnel Action (attachment 8), is the document used to record personnel actions after they are effective. . . . SF–50 simply documents the action.

J.A. at 181–82 (footnote omitted) (emphasis added). There is, moreover, a previous inconsistent decision by the Board of Appeals and Review (BAR) of the Civil Service Commission, In the Matter of ⎯⎯⎯⎯, No. 315H–73–71 (BAR 1973), J.A. at 244, to the effect that

> [the Deputy Assistant Regional Commission (Personnel)] performed the last act required of him when he notified ⎯⎯⎯ of his selection and told him to report for duty on February 26, 1971. The things that remained to be done before ⎯⎯⎯⎯ would enter on duty were details to be performed by the appointee and others, not by the appointing officer.

Id. at 3, J.A. at 246. The BAR was a predecessor of the current Merit Systems Protection Board (MSPB).[6]

The Government's principal reasons for the interpretation it offers in this case are in the form of an argument ab inconvenienti. Mr. Arch S. Ramsey, Acting Director of OPM, stated in an affidavit that "several compelling circumstances" require that an SF–50 be filled out before an appointment occurs. J.A. at 138. First is "the need for a definite and easily ascertainable time to determine when an appointment takes place"; second is the need for the appointment to be made by someone with actual appointment authority, as opposed to those endowed with only selection authority; third is the need to provide for the possibility that budget developments or the background investigations of those selected for sensitive positions might "make it impossible to actually employ the person receiving a letter." J.A. at 139. Thus, Mr. Ramsey did not cite any regulation or statute in direct support of his conclusion that completion of an SF–50 is the last act necessary to effect an appointment. Instead, his statement suggests that the OPM requires completion of the Form 50 as the last act because the consequences of doing otherwise are dire. This testimony establishes, to the extent that the consequences it claims are persuasive, only that had the completion of the Form 50 been the last necessary act, good reasons for the practice would exist. In these cases, however, the existence of the practice itself is called into question by, e. g., the Government's position in Foote as well as the testimony of record that the Form was sometimes left uncompleted for days after an entrance onto duty. Affidavit of John D.R. Cole, J.A. at 177. As to the consequences themselves, we are not convinced that chaos will follow a decision that appointment took place in these cases at some point prior to the filling out of a Form 50. Instead, the consequences depend on the rights or privileges that attach to appointee status and on the means by which

---

6. The Government's contention that this action has been overruled sub silentio by later BAR decisions, and in any event is not binding on the MSPB or the OPM, misses the point. Brief for Appellees at 30–31. We rely on In the Matter of ⎯⎯⎯ only to document the existence of a completely inconsistent opinion, nev-er expressly overruled, by a government agency with similar responsibility. Under these circumstances, testimony adduced for trial purposes, to clarify a point which previous written regulations and opinions left quite vague, is not entitled to deferential treatment by this court.

the government could act to specify clearly the point at which future appointments will take place.

The Government also contends that earlier cases have settled the question of when appointment to a federal job takes place. In our view, however, these cases are not very helpful. In *Shaw v. United States*, 622 F.2d 520 (Ct.Cl.), *cert. denied*, 449 U.S. 105, 101 S.Ct. 231, 66 L.Ed.2d 105 (1980), a subsidiary issue was determining the point at which the plaintiff began employment. The court decided, without discussion, that "plaintiff began employment on January 4, 1971, the date of his appointment evidenced in Standard Form 50." *Id.* at 528. In *Vukonich v. Civil Service Commission*, 589 F.2d 494 (10th Cir. 1978), the issue was whether the plaintiff had been appointed to a GS–9 position for which she was selected and then found unqualified, such that the decision not to hire her should have been cast as a removal action. The court decided that the decision not to hire did not constitute removal. It stated:

> In the paper-laden world of Civil Service, an appointment becomes effective only after a Standard Form 50, "Notice of Personnel Action," has been completed. That was not done in this case. The reason for the reliance of [the Civil Service Commission] on Form 50 is set out in the *Federal Personnel Manual*.

*Id.* at 496. The court then quoted the Personnel Manual at chapter 296, subchapter 2–1(a), which we have quoted at pages 243–244 *supra*. Two points should be made about *Vukonich*. The first is that, as stated above, no one disputes the fact that Form 50 is a basic document of federal employment; the question in these cases is whether one can be deemed *appointed* to a federal job prior to the time that a Form 50 is completed. Second, we note that the court reaches its conclusion, not by analyzing the appointment process to determine when the "last act" takes place, but merely by citing the FPM in a conclusory way. To

the extent that *Vukonich* may imply that under present law and Civil Service regulations no appointment may occur prior to the completion of a Form 50, we respectfully disagree.

The Government also cites *Goutos v. United States*, 552 F.2d 922 (Ct.Cl.1976), for the proposition that execution of a Form 50 is the last act of the appointment process; *Goutos* is, however, only peripherally relevant to these cases. In *Goutos* the question was whether the plaintiff had been promoted to a certain position or was continuing to serve in an "acting" capacity. The evidence established that the Civilian Personnel Officer with the authority to fill out the form necessary for promotion had not done so, despite requests to that effect by an intermediate employee.[7] The court found that the "final act required was the signature of the CPO on the form. The CPO never signed, so plaintiff was never appointed." *Id.* at 925. The evidence in that case was clear, however, that plaintiff was detailed as "Acting Chief" and that formal action by the CPO was required to make him Chief. These circumstances have no analogues in the cases before us.

It appears to us that the federal government played hide-and-seek with job-seekers, assuring them that jobs awaited them and only later—on occasion, after the prospective employee had acted on the assurance of a job—reversing itself. Not one of the approximately 20,000 members of the class which is the subject of these cases received a letter stating that he had been conditionally selected, subject to budgetary factors. Not one received a letter stating that he had been conditionally selected, subject to the discretion of the appointing officer to change his mind at any time prior to the completion of the Standard Form 50. All class members received letters stating that they had been selected for employment and should report for work on a certain date in the future.[8]

---

7. There the relevant form was Standard Form 52, "Request for Personnel Action."

8. The fact that selection letters were transmitted within one administration and the hiring freeze imposed by a subsequent administration cannot affect our analysis. In its capacity as

Underlying this system of apparent government indifference to the consequences of its actions has been the fiction of the Form 50, backed by predictions of the dire consequences that would follow if the fiction were to be retired. A fiction supported by speculation cannot, however, bear the burden urged upon it by the Government. On the basis of our analysis of the appointment procedures in use in these cases, as established by the Personnel Manual and the other evidence, we believe that the completion of the Form 50 was not the "last act" required of the appointing authorities within the meaning of *Marbury*. The members of the class before us were appointed to the positions for which they were unconditionally selected.[9]

■■■ The decision that the members of the class were appointees does not, we hasten to add, establish their right to relief. It remains to be decided whether those appointments were capable of being revoked and, if so, whether they were in fact revoked. Appointee status, by itself, does not offer class members any of the statutory protection due federal employees. To obtain the benefits of that protection, they must come within the definition of employee set forth in 5 U.S.C. § 2105(a).[10] That section provides, in relevant part, that:

(a) For the purposes of this title, "employee", except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—

(1) appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a Member or Members of Congress, or the Congress;

(C) a member of a uniformed service;

(D) an individual who is an employee under this section;

(E) the head of a Government controlled corporation; or

(F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105(a) (1976). Although we hold today that these class members met the requirement of subsection (1), they did not meet the requirements of subsections (2) and (3) of this provision. They remain, therefore, outside the protection of the statutory procedures established for employees. *See Baker v. United States*, 614 F.2d 263, 266 (Ct.Cl.1980) ("*all three* tests of this statutory definition" must be met for one to qualify as a federal employee).

■■ The question therefore becomes what nonstatutory protection, if any, exists for federal appointees. The general rule was established in *In the Matter of Hennen*,

---

employer, the federal government has a continuing obligation to act fairly and consistently towards those it seeks to hire.

9. The Government points out that in some cases the letters notifying class members of their selection were written by officials with "selecting" but not "appointing" authority. J.A. at 253. Therefore, it claims, the letters are not acts of appointing authorities and cannot create appointments. It is, of course, true that only properly authorized officials can make valid appointments. U.S.Const. art. II, § 2; 5 U.S.C. §§ 302, 3101 (1976); Federal Personnel Manual, ch. 311, subch. 1 (May 16, 1979). It is not necessary, however, that the letters notifying individuals of their appointments be written by the appointing authorities. All that is required is that the appointing authorities exercise their discretion in making the appointment. As the Government concedes, the appointing authority must approve the "selection" before the selecting official can send out the letter. Brief for Appellees at 4–5. This approval is the exercise of the appointing official's discretion.

10. Section 2105 provides the basic definition of employee in the title. Slightly different definitions appear in specific subchapters in reference to specific rights. 5 U.S.C. §§ 7511(a) (Supp. III 1979), 8311 (1976). The differences in definition are not relevant to this case.

38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839), where the question was whether a district judge had the power to remove a clerk of the court, whose tenure in office was specified in neither constitution nor statute. The Court held:

> All offices, the tenure of which is not fixed by the constitution, or limited by law, must be held either during good behavior, or (which is the same thing in contemplation of law), during the life of the incumbent; or must be held at the will and discretion of some department of the government, and subject to removal at pleasure. It cannot, for a moment, be admitted, that it was the intention of the constitution, that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made? In the absence of all constitutional provision or statutory regulation, it would seem to be a sound and necessary rule, to consider *the power of removal as incident to the power of appointment* . . . .
>
> In [the cabinet] departments, power is given to the secretary to appoint all necessary clerks (1 U.S. Stat. 68); and although no power to remove is expressly given, yet there can be no doubt, that these clerks hold their office at the will and discretion of the head of the department. It would be a most extraordinary construction of the law, that all these offices were to be held during life, which must inevitably follow, unless the incumbent was removable at the discretion of the head of the department: the president has certainly no power to remove. These clerks fall under that class of inferior officers, the appointment of which the constitution authorizes congress to vest in the head of the department.

*Id.* at 258–59 (emphasis added). Thus, the power to remove is held by the appointing authority, and only by the appointing authority. Absent relevant legislation, this continues to be the rule to the present day. *See, e. g., Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), in which the Court noted that "[i]t has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." *Id.* at 896, 81 S.Ct. at 1749 (citing *Hennen* and later cases).

We find this rule applicable to the cases before us. As this court noted in *Finley v. Hampton,* 473 F.2d 180 (D.C.Cir.1972), "any rights of a Government employee or applicant must be founded on a Congressional statute, expressly or by fair implication, . . . or a constitutional imperative." *Id.* at 189. Neither statute nor constitution provides a basis for holding, in these cases, that the appointing authorities could not revoke the appointments.[11] Plaintiffs argue that their appointment implies an absolute right to take the job, subject then to statutory removal procedures. Leaving aside the wisdom of such an implication, this court has no authority to create it judicially.

Chief Justice Marshall wrote in *Marbury* that "[w]here an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable . . . ." 1 Cranch at 162. In the application of this principle to the cases before us, we might well arrive at the same general result as did the district court. Our analysis requires, however, a closer examination of the power of revocation than that conducted by the district court. An appointee remains appointed, of course, until his appointment is properly revoked. The only one authorized to revoke an appointment is one authorized to make it. *Hennen,* 13 Pet. at 259. Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President.[12] The President can, of course, order

---

11. Plaintiffs' fifth amendment claim is discussed in the text beginning at pages 248–249 *infra.*

12. It is possible, however, that the President has authority under 5 U.S.C. § 3301(1), which establishes his power to prescribe regulations for entry into the civil service, to set aside as

the Secretary of Defense to revoke the appointment, and can fire the Secretary of Defense if he refuses to revoke it, but the President cannot revoke the appointment himself. *Id.* Similarly, the Office of Management and the Budget (OMB) and the Office of Personnel Management, each of which played significant parts in these cases, can act only through those with actual appointment authority. Therefore, one of the tasks that we are directing the district court to undertake on remand of the record is to determine whether all of the appointments made in these cases were properly revoked. If not, some of them remain in effect.[13]

■ The importance of proper, and timely, revocation is illustrated by the situation involving the twenty-two Treasury "employees" before this court. Following the district court's order of February 26, 1981, the Department of the Treasury dismissed fifty-two persons who had inadvertently been allowed to enter onto duty in violation of the hiring freeze. Twelve of these persons were eligible for exemptions from the freeze, and another eighteen, who had been transferred from other government agen-

cies, were returned to their original jobs. Plaintiffs sought to amend the district court's order as to the remaining twenty-two to provide that those for whom a Form 50 had been filled out, or for whom a Form 52 had been executed coupled with entrance onto duty, be excluded from the judgment. The court rejected this motion.

We believe that it follows from our conclusions on the appointment process that these twenty-two appointees, for whom no authorized revocation was made prior to entrance on duty, were employees of the federal government. 5 U.S.C. § 2105(a) (1976).[14] *See* accompanying note 10 *supra.* As such, they should have been excluded from the district court's order.[15]

■ Plaintiffs claim that the government action in these cases amounts to unconstitutional takings of property without due process. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). It is clear, however, that the bare facts before us—the shared facts of the class—do not give rise to a fifth amendment action.[16] The mere ex-

"void" appointments not made in accordance with these regulations. *Cf. Mow Sun Wong v. Campbell*, 626 F.2d 739 (9th Cir. 1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981) (President has authority to issue executive order *restricting* entry into federal employment). This issue is not raised in these cases because the appointments in question took place prior to the promulgation of the hiring freeze. *See* note 14 *infra*.

13. It would appear that a properly authorized refusal to allow a class member to enter onto duty on the date previously selected would be an effective revocation.

14. These individuals were also administered the oath of office. Transcript of March 12, 1981 at 12. The oath of office has traditionally been viewed as a significant element in the commencement of the federal employment relationship. 5 U.S.C. § 3331 (1976).

The district court concluded that the President's authority to order the freeze carried with it the authority to "rescind" appointments not made in accordance with the instructions and exceptions issued by OMB. Order of March 12, 1981, J.A. at 132. It dismissed the motion to amend the judgment on this basis. Our conclusion that class members were duly appointed

prior to the announcement of the freeze, however, renders this basis inadequate. Class members were appointed according to the regulations in effect at the time of the appointments. The Government does not attempt to argue that the hiring freeze provided the President with an independent basis—*i. e.*, independent of revocation by the various appointing authorities—for "voiding" or "rescinding" appointments made before the freeze was announced. Because we have decided that the revocations by the appointing authorities were inadequate in the case of these Treasury employees, we need go no further. *See* text at page 250 *infra*.

15. We also call the attention of the district court to named plaintiff Bernard Allan Willer, also apparently allowed to begin employment. Transcript of March 12, 1981 at 7–8.

16. Our conclusions as to plaintiffs' fifth amendment and estoppel claims do not mean that no plaintiff can recover for damages suffered because of the hiring freeze. The discussion above is based upon the bare facts of appointment and revocation that all of the members of the class share. We hold that no constitutional or estoppel claims exist on those facts. We

istence of a revocable appointment does not give a class member an entitlement. To hold otherwise would be to render meaningless the irrefutably revocable nature of the appointments, which is, as we have seen, a long-standing characteristic. *E. g., Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). No "legitimate claim of entitlement," *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, is created by the class members' wishful transformation of a revocable appointment into an irrevocable appointment. Moreover, as the district court noted, class members in these cases actually received "process" comparable to that which they would have received had they been probationary employees of the government: a statement of reasons for the action taken. 5 C.F.R. § 315.801—.806 (1980).

■ Plaintiffs also fail to sustain their estoppel claim on the facts before us. Even assuming that detrimental reliance by the class members could be proved, a matter suited to factfinding on an individual basis,[17] plaintiffs' claims, examined on a classwide basis, are still outside the range in which the government is liable to private parties. Plaintiffs make the bare assertion that "the government is estopped from denying [appellants'] employment claims." Brief for Appellants at 46. This necessarily amounts to a contention that class members relied upon an express or implied government representation that their "selections" were irrevocable; had they understood that the appointments were revocable, they would have no grounds for complaint. If an appointing authority were viewed as

having "promised" a class member that the class member was receiving an "irrevocable" appointment, however, estoppel would be barred on the grounds that the action was outside the authority of the agent. As this court stated recently in *Molton, Allen and Williams, Inc. v. Harris,* 613 F.2d 1176 (D.C.Cir.1980), the Supreme Court's decision in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), establishes the proposition that "the government is not estopped by the action of its agent when that agent acts without authority or contrary to law." 613 F.2d at 1178 (footnote omitted). *Merrill* remains good law. *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam). We are confident that if an "affirmative misconduct" exception exists to this rule, *see Santiago v. Immigration & Naturalization Service,* 526 F.2d 488 (9th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the conduct of the appointing authorities in these cases does not rise to an actionable level. Here, the problem was not misconduct by the responsible authorities, but the unjustified inference of irrevocability made by the class members. The facts of *Beacom v. EEOC,* 500 F.Supp. 428 (D.Ariz.1980), in which the court, as an alternative ground for decision, did find affirmative misconduct in connection with an offer of government employment withdrawn because of a hiring freeze, are materially different from the facts of these cases. There, plaintiff had called the agency office after the freeze was announced and was told that his pro-

---

express no opinion as to the possibility that the facts of a particular plaintiff's case may justify the imposition of liability on the Government. Those facts must first be found and a determination as to liability made by a district court. The process can begin on remand.

**17.** Reliance is an essential element of estoppel. *Parker v. Sager,* 174 F.2d 657, 661 (D.C.Cir. 1949). The existence or extent of reliance in these cases would obviously vary among individual class members. This was conceded by counsel for one of the plaintiffs at the hearing before Judge Pratt on plaintiffs' motion for a temporary restraining order:

THE COURT: And you don't rely on the possibility of their [sic] being a contract right which the Government is estopped from denying after there has been reliance and a change of position on the basis of prior representation?
MR. TOBIAS: We do not rely on that at this time, Your Honor. We think that that theory is certainly present in this case. However, we believe that in order to prove that theory up, that we would have to bring in every plaintiff and prove·it up. .
Brief for Appellees at 50 n.38. We assume the existence of reliance here only to dispose of plaintiffs' class-wide claim of estoppel.

spective employment was not affected, and that he could continue to wind down his law practice. There was later a delay in correcting this misinformation. These facts are not duplicated, at least as to the class as a whole, in these cases.

## II. CONTENTIONS RELATING TO PRESIDENTIAL AUTHORITY

 In addition to the arguments that are based directly on the government's treatment of the class members, e. g., appointment, due process, and estoppel, plaintiffs raise three arguments addressed to the legality of the hiring freeze, or certain parts of it, in and of itself. All of these involve the proposition, with different justifications, that the President lacked authority to impose the freeze in the way that he did. The first claim is that the President unlawfully rescinded the appointment authority vested in the department heads. Brief for Appellants at 40. As we discussed above, however, see note 14 supra, the President did not attempt to rescind the appointment authority of the department heads. Instead, he directed the relevant appointing authorities to implement the freeze and issued "instructions" for them to follow. J.A. at 108–09. Plaintiffs do not challenge his authority to do this.

As we pointed out in connection with the discussion of the twenty-two Treasury Department employees above, see note 12 supra, the issue raised by the intersection of the President's statutory authority to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service," 5 U.S.C. § 3301(1) (1976), and the authority of department heads to appoint inferior officers under Article II and 5 U.S.C. § 3101, is not actually present in these cases. The individual plaintiffs here were properly appointed pursuant to the regulations then in effect. There is no indication in the record that any

individual was appointed after January 20, 1981, in violation of the freeze order. We do not reach, therefore, the question whether such an appointment would be void under 5 U.S.C. § 3301(1).

The second contention is a limited one: that the hiring freeze as it affects the Veterans' Administration's (VA) budget violates 38 U.S.C. § 5010(a)(4).[18] This section provides in relevant part:

(A) With respect to each law making appropriations for the Veterans' Administration, there shall be provided to the Veterans' Administration the funded personnel ceiling defined in subparagraph (D) of this paragraph and the funds appropriated therefor.

(B) In order to carry out the provisions of subparagraph (A) of this paragraph, the Director of the Office of Management and Budget shall, with respect to each such law (i) provide to the Veterans' Administration for the fiscal year concerned such funded personnel ceiling and the funds necessary to achieve such ceiling * * *.

 * * * * * *

(D) For the purposes of this paragraph, the term "funded personnel ceiling" means, with respect to any fiscal year, the authorization by the Director of the Office of Management and Budget to employ (under the appropriation accounts for medical care, medical and prosthetic research, and medical administration and miscellaneous operating expenses) not less than the number of employees for the employment of which appropriations have been made for such fiscal year.

38 U.S.C. § 5010(a)(4) (Supp. III 1979). Plaintiffs contend that the implementation of the hiring freeze violates the statutory obligation of OMB to provide the "funded personnel ceiling" to the VA under this section. See Train v. City of New York,

---

18. Although we are mindful that it is not the place of an appellate court to decide matters raised for the first time on appeal, see Hormel v. Hevering, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941), we believe that the special circumstances of this case make the resolution of this particular purely legal question appropriate. Id.; Milhouse v. Levi, 548 F.2d 357, 363 (D.C.Cir.1976).

420 U.S. 35, 98 S.Ct. 839, 43 L.Ed.2d 1 (1975). In support of this contention, they point to the following from the legislative history of the provision:

> The compromise agreement requires the Director of OMB to provide to the VA the personnel ceiling for VA health-care staffing for which appropriations are made * * *.

> The Committees believe that it is essential that, when the Congress appropriates funds specifically designated for VA personnel levels, OMB not thwart the will of Congress by requiring the VA to use the funds so appropriated for other purposes (as occurred in fiscal year 1979 when funds appropriated for additional personnel were diverted, at OMB's direction, to cover in part the VA's cost of the Federal government pay raise).

125 Cong.Rec. H11648 (daily ed., December 6, 1979), Explanatory Statement of H.R. 3892, The Veterans' Programs Extension and Improvement Act of 1979. Plaintiffs apparently believe that the intended personnel levels for the three specific VA accounts in question are indicated by the legislative history of the appropriations act in effect at the time of the hiring freeze, the Department of Housing and Urban Development—Independent Agencies Appropriation Act, 1981, Pub.L.No. 96–526, 94 Stat. 3044, 3059 (1980).[19]

On January 15, 1981, the Director of OMB certified in writing to the Chairman of the House and Senate Veterans' Affairs Committees that positions equal to or slightly in excess of the required number had been made available. OMB apparently later indicated, however, that the hiring freeze would be applied to positions funded under 38 U.S.C. § 5010(a)(4), and plaintiffs challenge this application. Plaintiffs have chosen to pursue this point largely along the lines set forth by the Comptroller General in a letter of February 19, 1981, to the Ranking Minority Member of the House Committee on Veterans' Affairs. Opinion No. B–198103, Comptroller General of the United States. This letter, prepared without the formal cooperation of OMB, concluded that "38 U.S.C. § 5010(a)(4) precludes the administration from using the President's hiring freeze, as implemented by OMB Bulletin No. 81–6, to reduce congressionally funded VA employment levels." *Id.* at 8.

The Government asserts that plaintiffs' claim that the freeze violates section 5010(a)(4) arises from a "misapprehension" of the phrase "funded personnel ceilings." Supplemental Memorandum for Defendants at 4. According to the Government, the personnel ceiling is properly viewed in terms of "staff years" or full-time equivalent employment, not "in terms of individuals employed." *Id.* at 5. Thus

> the "personnel ceiling" does not require that the VA be able to employ some specified number of employees at all times during the fiscal year.... [T]he personnel level reflected in the legislative history is met so long as the VA is permitted during the fiscal year to employ enough individuals who work enough hours so that at the conclusion of the fiscal year the appropriate number of staff years have been worked.

*Id.* at 6. We do not believe that the "staff year" concept can properly be contorted to justify the interpretation urged by the

---

**19.** The reports must be read together with the President's budget requests to yield the appropriate figures. H.R.Rep.No.96–1476, 96th Cong., 2nd Sess. (1980) (Conference Report); S.Rep.No.96–926, 96th Cong., 2d Sess. (1980); Opinion No. B–198103, Comptroller General of the United States (Feb. 19, 1981) at 4. The Memorandum prepared by the Office of the Legal Counsel for OMB, and included as an appendix to the Special Memorandum of the Appellees, noted that "we understand that OMB does not take issue with the Acting Comptroller General's view that the legislative history of the FY 1981 VA appropriation statute specifies certain numbers of employees for the employment of which the committees thought that appropriations were made." Memorandum for Michael J. Horowitz at 3. If the Government does, in fact, challenge the Comptroller General's conclusions as to the levels for which Congress intended to provide, the matter can be fully explored by the parties before the district court. Our decision on this point is not dependent upon the finding of any particular level but rather upon the finding that some specified level did exist.

Government. The concept of "staff years" is a device used to adjust the employment levels specified in the legislative history of the appropriations act to take into account part-time workers and similar factors. Nothing cited by the Government suggests that the concept of a "funded personnel ceiling" for a given fiscal year can be disregarded in favor of a simple cumulation of hours at the end of a fiscal year. The very structure of the statute precludes this construction in that the statute requires that the Director of OMB certify to Congress early in the fiscal year that the specified level is being funded, and that the Comptroller General submit to Congress, also early in the fiscal year, a report stating whether the Director of OMB is complying with the Act. 38 U.S.C. § 5010(a)(4)(B), (C) (Supp. III 1979). The Government's construction of the Act would make such certifications and reports impossible. We therefore reject it as without foundation in the language or purpose of the Act.

■ Through the incorporation, as an appendix to its Supplemental Memorandum, of an Opinion of the Office of Legislative Affairs, Department of Justice to the OMB (Memorandum for Michael J. Horowitz), the Government apparently argues that section 5010(a)(4) was not violated by the hiring freeze because Congress did not effectively provide for the hiring of the employment levels specified in the legislative history. According to OMB, the appropriations for the fiscal year ending September 30, 1981, "are insufficient under any calculation to pay the salaries of the numbers of personnel under the three medical accounts...." Memorandum for Michael J. Horowitz, April 10, 1981, at 4. Since the Act provides that the "funded personnel ceiling" established is the number of employees "for the employment of which appropriations have been made," § 5010(a)(4)(D), it would appear that the "funded personnel ceiling" established for fiscal year 1981 may not be at the level that Congress intended. If so, the hiring freeze may not have violated

section 5010(a)(4), depending upon the employment level actually funded by Congress. On remand, the district court should make findings as to the "funded personnel ceiling" actually appropriated for by Congress and the levels to which employment was limited pursuant to the hiring freeze. To the extent of the shortfall, if any, we hold that the hiring freeze, as applied, violated 38 U.S.C. § 5010(a)(4) and is therefore invalid.

■ Plaintiffs' third argument is that the hiring freeze as promulgated violates the Impoundment Control Act of 1974 (ICA), 31 U.S.C. § 1400 et seq. (1976). The essence of this argument is that the "freeze constitutes a refusal to spend appropriated funds" such that the procedures established in the ICA must be followed. Brief for Amicus Curiae Public Citizen at 4.

For several reasons we believe that resolution of this question at this time would be inappropriate. First, this argument was advanced clearly only upon appeal. Second, subsequent developments such as congressional action may have mooted certain facets of this contention. Third, and most significant, resolution of this question involves examination of the various appropriation statutes involved. In this respect, the analysis of this issue is related to the analysis employed in determining whether Congress has mandated a certain level of personnel funding, as it did in appropriating certain funds for the Veterans' Administration. 38 U.S.C. § 5010(a)(4) (1976). See text beginning at page 22 supra. Should such a mandate be discovered, of course, plaintiffs' ICA claim need not be reached.[20] These matters are more suited to analysis, in the first instance, by the district court.

## III. CONCLUSION

At this stage in the development of our Republic, the conclusion that presidential authority is not infinite should come as no surprise. Ours is a system of checks and

---

**20.** The Government has not attempted to use the ICA to justify the freeze. Supplemental

Memorandum for Defendants at 3.

balances, premised upon the separation of powers. A. HAMILTON, J. JAY & J. MADISON, THE FEDERALIST. Although the context in which these claims arise is new, the issues raised in these challenges to President Reagan's hiring freeze are not. When does an appointment take place? Who can revoke an appointment, and when can it be revoked? When can the President spend less money for hiring than Congress has appropriated? These questions do not require a redefinition of the scope of presidential authority. Instead, they require the application of well-established principles to the new circumstances before us.

We believe that the class members before us were appointed to federal jobs. In some cases, however, the appointments were properly revoked. For the reasons set forth in this opinion, those plaintiffs within this category are not entitled to relief on a class-wide basis. In other cases, class members were allowed to enter onto duty as federal employees. Once they did so, their appointments could not be revoked. It is possible that there exists a third group of class members: those whose appointments were not properly revoked and who did not enter onto duty. The status of these individuals, even the fact of their existence, must be developed below and possibly through future litigation.

As to presidential authority to order a government-wide hiring freeze, one proposition is manifest. The President cannot simply ignore a congressional directive to hire a specified number of persons for whom funding has been mandated. Where the record is sufficiently developed to allow us to isolate such a situation—as in the case of 38 U.S.C. § 5010(a)(4) and its accompanying appropriations act—we have found the President's action unlawful. If further examples are found below, the task of the district court is clear. The role to be played in this controversy by the Impoundment Control Act must also be explored by the district court.

The record in this case is remanded to the district court for further development of certain claims, consistent with this opinion.

*It is so ordered.*