**Lorraine B. PRATTE, Plaintiff,**

v.

**NATIONAL LABOR RELATIONS BOARD, et al., Defendants.**

**No. 81 C 6284.**

United States District Court, N. D. Illinois, E. D.

Dec. 22, 1981.

Wrongful Death 223 (1966).

Peggy A. Hillman, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiff.

Steven A. Miller, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

### SHADUR, District Judge.

Lorraine Pratte ("Pratte") has sued the National Labor Relations Board ("NLRB"), its General Counsel and the Regional Director of its Region 13 (headquartered in Chicago), seeking injunctive and declaratory relief because of NLRB's claimed unlawful revocation of Pratte's appointment as a staff lawyer. By agreement of the parties, their written submissions (the verified Complaint and affidavits) constitute the evidentiary record for this Court's ruling under Fed.R.Civ.P. ("Rule") 65(a). In accordance with Rule 52(a) this memorandum opinion and order reflects the Court's findings of fact and conclusions of law.

### Findings of Fact

Pratte is a June 1981 graduate of Harvard Law School, where she established a fine record (among other things, as Articles Editor of the *Civil Rights-Civil Liberties Law Review*). Because she decided on labor law as a field of interest, she applied to NLRB's national office and the Chicago Regional Office.[1] In mid-January 1981[2] NLRB offered her employment as a Law Clerk-Trainee (Grade GS-9) at an initial salary of $18,585 a year. Pratte accepted the offer with alacrity, turning down a higher-paying position as an Assistant District Attorney in Philadelphia and abandoning any other placement efforts.

On February 3 (just a week after Pratte's prompt acceptance) the same NLRB person who had extended the offer[3] wrote to say NLRB was "unable to honor the written commitment which was made to you after November 5, 1980." That action was occasioned by President Reagan's January 20 announcement of an immediate hiring freeze for all civilian employees of government agencies. But the letter went on:

> We regret the necessity for this action; however, we will place your application in the group who will be given first priority for positions with this Agency when we are able to renew our hiring program.
>
> The instructions from the Office of Management and Budget provide that agency heads may request exemptions from the freeze where they believe that circumstances warrant such action. We intend to submit such a request to OMB concerning your situation and we will advise you of the results once they are received from OMB.

---

1. Pratte sought to work for NLRB as an entree into the field of labor relations law. Work in the Region 13 office was particularly desirable because of the extensive trial experience she was told to expect early in her career, experience that would serve her well in future career opportunities in the labor relations field.

2. Because all relevant dates occurred during 1981, no further year designations will be made in the statement of facts.

3. B. Fred Toback ("Toback"), Executive Assistant in the Division of Operations Management, was the author of each of the letters extending and withdrawing offers (January 16, February 3, March 17, August 5 and September 29) discussed in this opinion.

We sincerely regret any inconvenience that the hiring freeze has placed on you, and we hope that your interest in working for the NLRB will continue.

True to its word, NLRB wrote Pratte March 17:

In my letter of February 3, 1981, I regretably [sic] had to advise you that this Agency could not honor the written offer of employment which had been made to you after November 5, 1980. I am now pleased to inform you that the National Labor Relations Board has recently received its new authorized personnel ceilings for Fiscal Year 1982 from the Office of Management and Budget. We are now able to extend offers of employment for professional positions.

It therefore offered employment on the same terms as before. Just as with the initial offer the Toback letter said:

You will be assigned to our Chicago Regional Office, and we will expect you to enter on duty on or about October 5, 1981, which is the beginning of Fiscal Year 1982. If our budget permits, some new employees may be able to enter on duty prior to October 5, 1981. If you accept our offer, please indicate when you will be available to commence work.

Toback's letter was confirmatory of the telephone call that had been made to Pratte by NLRB's Deputy General Counsel March 10. At that time she was told to "hold on" if she could because NLRB had been informed by the Office of Management and Budget that "the money would be coming through." Just three days after receiving the new Toback letter Pratte visited his office in Washington and drafted and delivered a handwritten acceptance letter. She had already forwarded the requested security clearance forms at the time of the original offer, so that she understood all systems were "go."

By letters dated August 5 and August 31 NLRB confirmed Pratte's appointment. Its August 5 letter spoke in future terms ("You will be appointed as a Law Clerk-Trainee ... effective October 5, 1981"). August 31 converted that to the present:

This will confirm your Accepted Appointment as Law Clerk (Trainee), GS-904-09, $18,585 per annum. Assignment is in our Chicago Regional Office located at the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago, Illinois. This is a sensitive position and the appointment is subject to a Full Field Investigation under Executive Order 10450. It is also subject to an Administrative Trial Period of One year. All other conditions will remain as stated in Mr. Toback's letter to you dated 8-5-81.

\* \* \* \* \* \*

A tentative reporting date of October 4, 1981, has been set pending receipt and approval of your medical certificate.

We look forward to your joining the National Labor Relations Board staff.

All the conditions referred to in the August 5 and August 31 letters have been satisfied.

If Pratte had been advised that the appointment was subject to any other conditions (most specifically, possible rescission on the basis of potential future budget reductions) she would not have accepted the appointment. But understanding the appointment to be unconditional (except for the purely ministerial acts that offered no problem) she did accept, and her reliance on the appointment was extensive and uncontradicted:

(1) Of course she ceased to seek other employment.

(2) Based on NLRB's requirements for lawyers, Pratte took the bar examination in the District of Columbia, which would permit her to practice as a government lawyer anywhere. That necessarily made her a less marketable commodity (particularly in the litigation area in which her primary interests lie) in the private practice in Illinois, where she found herself compelled to look for employment after NLRB's later attempted revocation.

(3) Having been advised of the need for NLRB regional office staff lawyers to travel as part of their work, Pratte purchased an automobile.

(4) On September 26 Pratte drove to Chicago. After checking with the Region 13 office and receiving confirmation of her official October 5 reporting date, she signed a one-year apartment lease in Chicago.

One day after NLRB's confirmation of her official reporting date, and the same day on which she had signed her lease, Pratte received a telephone call from NLRB's Washington office stating her appointment was being "revoked" as a result of a September 24 speech by President Reagan in which he announced he would ask Congress to approve additional budget reductions for certain federal agencies for fiscal year 1982. On September 30 she received a billet-doux from Toback predicated on the proposed cut in appropriations and stating:

> Therefore, we must inform you that we must rescind our offer of employment in which you were asked to report for duty on October 5, 1981.

This "Dear John" letter concluded in much the same tone as the earlier February 3 "unable to honor the written commitment" letter:

> We very much regret the necessity for this action. Please be assured that you will be placed in the group of individuals who will be given priority consideration for positions with this Agency when we are again in a position to permit additional applicants to report for duty.
>
> We sincerely regret any inconvenience which this current hiring situation has caused you, and we appreciate your interest in working for the National Labor Relations Board.

Finding herself unemployable as an Illinois lawyer, Pratte was able to obtain a temporary paralegal job. As soon as she was able to confer with counsel and prepare a Complaint and supporting documents she instituted this action.

## Conclusions of Law

There is of course no dispute as to the familiar criteria to be employed in deciding on the propriety of preliminary injunctive relief. They were again repeated by our Court of Appeals this month in *Machlett Laboratories, Inc. v. Techny Industries, Inc.,* 665 F.2d 795 (7th Cir. 1981), and require a plaintiff to show that (adapted to this case):

> (1) [she] has at least a reasonable likelihood of success on the merits,
>
> (2) [she] has no adequate remedy at law and will otherwise be irreparably harmed,
>
> (3) the threatened injury to her outweighs the threatened harm the preliminary injunction may cause the defendants, and
>
> (4) the granting of the preliminary injunction will not disserve the public interest.

At the threshold the Court must inquire into the reasonable probability of plaintiff's success on the merits. Though many of our Court of Appeals' decisions list the factors in a different sequence, *O'Connor v. Board of Education,* 645 F.2d 578, 580 (7th Cir. 1981) has made that priority plain.

On that threshold issue the government's presentation does it little more credit than its actions as to Pratte. Its responsive memorandum (G.Br. 10–15) deals with the arcane mysteries of "appointment" by the federal government (a necessary condition of becoming an "employee" as defined in 5 U.S.C. § 2105(a)) and concludes by explaining why *Beacom v. EEOC,* 500 F.Supp. 428 (D.Ariz.1980) is distinguishable, or if not, should not be followed. But it fails utterly to discuss or even mention, in that context,[4] the most recent decision by a Court of Appeals, *National Treasury Employees Union v. Reagan,* 663 F.2d 239 (D.C.Cir.1981), which discusses, distinguishes and rejects each of the several authorities on which the government seeks to rely.

█ It is unnecessary to repeat the analysis in *National Treasury Employees.* For

---

4. True enough the government's memorandum later mentions *National Treasury Employees,* but in a different section and on a different issue.

the reasons there stated at length, the Court finds that the Form 50 on which the government relied there as here (a form self-characterized as a "*Notification* of Personnel Action") is not itself the personnel action—the document constituting the "appointment." Indeed Form 50's title itself tends to confirm that (though that is but one of the factors pointing to the Court's conclusion).

*National Treasury Employees* is a thoughtful, well-reasoned and comprehensive opinion. This Court will not essay to reinvent the wheel, but will instead quote the persuasive and relevant portion of the opinion stating (at 245–246):

> It appears to us that the federal government played hide-and-seek with job-seekers, assuring them that jobs awaited them and only later—on occasion, after the prospective employee had acted on the assurance of a job—reversing itself. Not one of the approximately 20,000 members of the class which is the subject of these cases [in our case, Pratte] received a letter stating that he had been conditionally selected, subject to budgetary factors. Not one received a letter stating that he had been conditionally selected, subject to the discretion of the appointing officer to change his mind at any time prior to the completion of the Standard Form 50. All class members received letters stating that they had been selected for employment and should report for work on a certain date in the future.
>
> Underlying this system of apparent government indifference to the consequences of its actions has been the fiction of the Form 50, backed by predictions of the dire consequences that would follow if the fiction were to be retired. A fiction supported by speculation cannot, however, bear the burden urged upon it by the Government. On the basis of our analysis of the appointment procedures in use in these cases, as established by the Personnel Manual and the other evidence, we believe that the completion of the Form 50 was not the "last act" required of the appointing authorities within the

meaning of *Marbury*. The members of the class before us were appointed to the positions for which they were unconditionally selected.

■ Just so Pratte received a letter from NLRB saying in essence, "You are hired. You are one of our lawyers," without the slightest reference to any aspect or condition of budgetary restraints. For the reasons so well expressed in *National Treasury Employees* and fully applicable here, the Court holds that Pratte was in fact "appointed" by her acceptance of the August 5 Toback letter and the August 31 confirmation of appointment.

■ That however brings Pratte only part-way home. Because Pratte had not entered into "performance of the duties of [her] position" before NLRB reversed its field and told her not to report, she was not technically an "employee" within the definition of 5 U.S.C. § 2105(a). That meant that she was lacking the statutory protection afforded "employees." *Baker v. United States*, 614 F.2d 263, 266 (Ct.Cl.1980) so teaches, and *National Treasury Employees* confirmed that proposition and went on to define the nonstatutory protection of an appointee. It said (at 247), "An appointee remains appointed, of course, until [her] appointment is properly revoked." And it continued (*id.* n.13), "It would appear that a properly authorized refusal to allow [an appointee] to enter on duty on the date previously selected would be an effective revocation."

Certainly NLRB's September 29 letter was such a "refusal." Thus the question was whether the refusal—the revocation—was "proper" as *National Treasury Employees* would require.

*National Treasury Employees* provides no answer beyond that stage of the inquiry. At that point the opinion went on to deal with the class issues. It did however recognize quite specifically that (at 253), "It is possible that there exists a third group of class members: those whose appointments were not properly revoked and who did not enter onto duty."

Accordingly this case resolves itself to the question of the propriety of the attempted revocation, really a question of timeliness. Its answer depends on whether detrimental reliance of the type that would give rise to an estoppel, occurring before an attempted revocation, precludes the revocation from being timely and thus proper.

Our Court of Appeals is not among those that use the simplistic terminology that the government may never be estopped. Instead it recognizes estoppel against the government in appropriate circumstances, although it urges great caution. *Gressley v. Califano*, 609 F.2d 1265, 1267–68 (7th Cir. 1979); *United States v. Fox Lake State Bank*, 366 F.2d 962, 965–66 (7th Cir. 1966).

■ This opinion has already identified Pratte's substantial reliance on her appointment. She ceased seeking other employment. She took the District of Columbia bar examination in reliance on NLRB's requirements, rather than taking the bar in the jurisdiction where she contemplated working—this made her much less employable locally in private practice. Because of the travel requirements for an NLRB staff attorney she bought an automobile. She signed a one-year apartment lease *after* speaking with NLRB personnel just a week before she was due to report—and after having been given no warning.

Reliance then is established. Estoppel however requires that reliance be *reasonable*. On that score it seems to the Court that it is bizarre in the extreme for the government to say on the one hand that *Pratte* should have been on notice of a possible repeat performance of the original offer and withdrawal, and on the other hand that the *government* was not. What the government really advances is the extraordinary notion that the agency had no reason to believe that the budgetary state of affairs would change so drastically in September, yet may hold Pratte to a more strict standard than that. Which of the parties really knew the facts? Had NLRB stated the risk or had it included any caveat when it renewed the offer and later confirmed Pratte's appointment, she would not have taken the job. Instead NLRB's only reference to budget was not in restrictive, but rather in expansive, terms. Its March 17 offer effectively said, "Maybe if we get more money you can report earlier." It gave her every reason to believe that the original problem that had caused the withdrawal of its initial offer had been resolved. Indeed it was NLRB and not Pratte that was on notice of the potential of reduction by June 1981, when Congress enacted a final budget for fiscal 1981 rescinding $1 million out of NLRB's prior approval. Nevertheless it sent her a confirmation of appointment nearly three months later.

Frankly the Court considers the government's position somewhat disingenuous. NLRB induced action by Pratte when that suited its needs. This Court's many years as a law firm hiring partner make plain what NLRB did here: When hiring is done it is done pursuant to the employer's contemplated needs, and with the firm expectation that the hired associate will in fact report for work. Any defeated expectation can create serious disruption for the employer in a seller's market. Today however we are in a buyer's market for young law graduates, and it appears quite obvious that NLRB has seriously disadvantaged Pratte.

It is however not necessary to decide the ultimate issue of whether estoppel will lie. At this point in the proceedings the only question is whether Pratte has demonstrated a reasonable likelihood of success on that issue. That, it seems to the Court, cannot be gainsaid in light of the Seventh Circuit decisions on estoppel, the *Beacom* case and the holding in *National Treasury Employees*.

■ Determination of the reasonable likelihood of success also controls the question of what constitutes the status quo, an issue on which each party's argument is somewhat circular. NLRB's assertion that the status quo is non-appointment hinges on its argument that Pratte was never "appointed." In much the same way Pratte's contention that the government is seeking to change the status quo, while she is trying to preserve it, hinges on her argument that she was "appointed."

With the threshold having been crossed, we turn to the "adequate remedy at law" or "irreparable harm" issue. In this case, that is peculiarly within the ken of lawyers: We are dealing with the impact on a lawyer of this kind of conduct. Many of the major burdens on Pratte, it is true, are financial, though incidentally some might pose difficulties in terms of recovery. Though she wouldn't otherwise have bought a car, presumably she got value for what she paid. Much the same applies to her apartment lease. Presumably her lost earnings during the employment period would be recoverable if she succeeds on the merits.

But how do remedies at law deal with the long-term career impact, the loss of placement opportunities,[5] the loss of valuable experience and of promotion opportunities? Law students with top records from top-ranked national law schools are highly salable commodities, but that is much less true of a law graduate forced into a market at a time when hiring generally has become more uncertain and in an unseasonable period in relation to the normal hiring season. All those factors, amplified as they are by Pratte's decision as to which bar exam to take (a decision made in reliance on NLRB), satisfy the second condition for preliminary injunctive relief. This is much like the familiar situation in which a wrongdoer is not heard to assert that the plaintiff can't show harm, where it is really the wrongdoer's own conduct that created the difficulty in doing so.

■ As to the third factor, the balancing of harms, the government argues that the harms just outlined as to Pratte are outweighed by harms to the government. That contention is without merit. First, neither side has focused on one significant factor, though Pratte does argue that the government predicates its decision not on *present* harm (at this point NLRB still has the funds needed to honor its hiring commitments in hand[6]) but on possible *future* effects. More to the point is that if Pratte is successful on the merits, NLRB is liable for her salary in damages in any case. Thus any harm to NLRB arising out of an injunction is really no different from the damages it confronts by reason of the claim. Second, the current decision is of very limited scope. Circumstances applicable to Pratte may well not apply to *anyone* else, let alone to the entire group of appointees NLRB has now sought to reject. In any balancing of harms the Court then concludes Pratte must prevail.

■ Finally the Court turns to consideration of the public interest. There is a paramount public interest in government responsibility—a quality singularly lacking on the uncontroverted facts here. What countervailing public interest does the government advance? Teaching young lawyers to watch out when they deal with government? If the public interest lies in promoting the orderly operation of the agency, NLRB might better address its arguments to the administration and to Congress rather than to Pratte or this Court.

■ All criteria for issuance of a preliminary injunction have been met. One last comment may nevertheless be in order. In substantial part the government seeks to rely on authorities that deny preliminary injunctive relief where complete retroactive relief is available in administrative proceedings, or in judicial review of such proceedings. But Pratte occupies the no-man's-land[7] between appointment and service: She doesn't have the benefit of administrative proceedings, precisely because she is *not* an "employee." Consequently the Court concludes that the otherwise-existing right to a preliminary injunction is not lost for the reason advanced by the government.

---

**5.** Parenthetically Harvard's placement service is much less useful to alumni than to students, because it is geared to serve the latter and the prospective employers seeking to hire them upon graduation. Because this particular piece of information derives from the Court's knowledge outside the record, it has not been taken into account in arriving at the Court's decision.

**6.** There is a question as to an agency's right to husband currently appropriated funds against contingent future needs.

**7.** No pun or chauvinistic purpose is intended.

Rule 65(a) has been dealt with, but Rule 65(c) remains. Because Pratte could not provide the funds necessary for any significant bond required under that Rule, and NLRB has not made any showing of damages in any case, the Court determines that no bond should be required under Rule 65(c) and waives the provision of such a bond.

Counsel are requested to prepare and submit a draft order granting a preliminary injunction as prayed in the Complaint and approved in this opinion.