**Constance HORNER, Director, Office of Personnel Management, Petitioner,**

v.

**Raymond ACOSTA, et al., Respondents,**

**Merit Systems Protection Board, Intervenor.**

Appeal Nos. 84–1160, 85–2187.

United States Court of Appeals, Federal Circuit.

Oct. 8, 1986.

As Amended Oct. 3, 1986.

---

Robert A. Reutershan, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for petitioner. With him on brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director. Earl A. Sanders, Office of the Gen. Counsel, Office of Personnel Management, of counsel and Naomi J. Miske, Office of the General Counsel, Dept. of the Navy, of counsel.

Bernard Fensterwald, III, Fensterwald, Alcorn & Bowman, P.C., Arlington, Va., argued for respondents.

David Kane, Merit Systems Protection Board, Washington, D.C., argued for intervenor. With him on brief were Evangeline W. Swift, Gen. Counsel and Mary L. Jennings, Associate Gen. Counsel for Litigation.

Before MARKEY, Chief Judge, COWEN, Senior Circuit Judge, and ARCHER, Circuit Judge.

ARCHER, Circuit Judge.

The decision of the Merit Systems Protection Board (MSPB or Board), 19 M.S.P.R. 101, holding that respondents, although not appointed to federal positions during the time periods in issue, were entitled as contract employees to service credit under the Civil Service Retirement Act (CSRA) is reversed.

*Background*

A. In 1968, the Department of the Navy formed a unit[1] to perform intelligence functions. Because of its special requirements, such as non-attribution and ability to hire, fire, transfer and compensate personnel without regard to the civil service laws, the Navy created a personnel system distinct from, but similar in many respects to, the civil service system. The commanding officer of the organization was authorized to engage the services of individuals to carry out its mission. An elaborate system of recruiting and interviewing was established, and the final interview was conducted by a hiring board of three naval officers and two civilians which made recommendations to the commanding officer. Individuals were recruited through direct contact, third party referrals and disguised newspaper advertisements. Prospective candidates were not cognizant of the connection of the job with the government until advised by the hiring board after it had determined to recommend their hire.

Individuals selected to participate in the program were required to enter into a contract for personal services with the Navy (designed a "career provisional contract" or "career contract") or with a proprietary corporation. Each proprietary corporation used was incorporated by the Navy, created solely to provide cover and support for intelligence functions, funded with public funds and controlled by a Navy officer. When the contract was with the Navy, it was signed by a contracting officer, and by the commanding officer as contract approving officer. An official of the proprietary corporation signed the contracts on its behalf.

Civil service documentation and other formalities in connection with the hiring were not utilized.[2] The contracts, whether entered into with the Navy or its proprietary corporation, provided expressly that respondents were independent contractors. They provided for compensation on a regular basis and within-grade promotions, legislative pay adjustments and a post differential in substantial conformance with rules and regulations applicable to government appointed personnel. Other benefits covered by the contracts included living quarters allowances, annual and home leave, health benefits for the individual and dependents for illness or injury incurred in the line of duty while abroad, life insurance and a retirement plan. All benefits, such as health, life and dental insurance and retirement programs, were funded through the proprietary corporations and underwritten by private insurers. The salaries of respondents, which were subject to Social Security withholding taxes, were paid by the proprietary corporations with appropriated funds.

After their selection, respondents were trained by other employees of the unit or at government training facilities, issued government identifications, official passports, and other documents. Those documents represented that respondents were federal employees but did not identify their true positions or functions. At all times active duty naval officers, or other unit employees under the supervision of naval officers, supervised respondents and determined their retention in or discharge from the unit. The Board found that the naval officers involved in the hiring process considered the respondents to be federal employees but did not believe they were "being appointed in the civil service" or were "regular civil service employees."

B. In 1979, respondents filed claims with the Office of Personnel Management (OPM) seeking service credit for retirement and other purposes in respect of their employment in the unit during various periods of time between 1968 and 1976. OPM, both in its initial decision and on reconsid-

---

1. Due to the classification of information, the Board used the term "unit" to refer to this organization.

2. No Standard Form (SF) 50 or 52 was prepared for respondents. An SF–50 is a standard form, entitled "Notification of Personnel Action," used to record a federal personnel action. An SF–52, entitled "Request for Personnel Action," is used to initiate a personnel action. Additionally, the oath of office typically given to federal employees was not administered to respondents (except in one instance).

eration, denied the claims on the basis that respondents had not been appointed in the civil service.[3]

On appeal to the MSPB, the Chief Administrative Law Judge (CALJ) reversed OPM's denial of respondents' claims for service credit, concluding that respondents' contractual arrangement constituted an appointment in the civil service within the meaning of 5 U.S.C. § 2105 (1982). By final decision dated January 20, 1984, the Board affirmed on different grounds. It held that respondents had not been appointed in the civil service, but nevertheless found respondents to be entitled to service credit based on a provision of the Federal Personnel Manual Supplement 831–1, Subchapter S3–3 (September 21, 1981) (FPM Supplement) allowing contract service to be credited.[4] OPM has petitioned this court for review of the MSPB decision under 5 U.S.C. § 7703(d) (1982).

C. In March 1984, respondents submitted petitions for enforcement to the Board contending that OPM had failed to comply with the Board's final decision rendered January 20, 1984. The CALJ dismissed the respondents' petitions for enforcement in August 1984, finding that the documentation which OPM had prepared for inclusion in respondents' retirement records constituted sufficient evidence of full compliance with the Board's final decision. Upon petition for review to the full Board, this decision was affirmed. Respondents have cross-appealed on this issue.

### Preliminary Issue

■ The MSPB has intervened in this case. It asks the court *inter alia* to deny OPM's petition for review for failing to meet the substantial impact requirement of 5 U.S.C. § 7703(d) (1982). Under § 7703(d), the Director of OPM seeks review of a final Board decision upon a determination:

[T]hat the Board erred in interpreting a civil service law, rule, or regulation affecting personnel management ˙and that the Board's decision will have a substantial impact on a civil service rule, regulation or policy directive....

The Board argues that the revisions to the FPM Supplement on March 29, 1985 [5]

---

3. OPM did not dispute that respondents were performing a federal function or that they were supervised by federal employees during the time period at issue.

4. The pertinent part of the FPM Supplement is set forth below:

   S–3 DISCUSSION OF CIVILIAN SERVICE
   *   *   *   *   *   *
   c. Contract service. Service rendered under special contract may usually be credited if the contract contemplates full-time or specified part-time personal service of the person obligated by the contract under the daily supervision and control of a Federal official, or if the periods of actual service made of record are computable. However, a contractor engaged for special and single transactions, even though paid from appropriated funds, is not considered to be a Federal employee. Neither is a person who enters into a contract for furnishing a particular item, such as a report or plan which does not necessarily require the individual's personal services. Service under a contract under which an organization other than the Federal Government has the power to terminate the service is not Federal employment.

5. On March 29, 1985, OPM rescinded the FPM Supplement (September 21, 1981).

The replacement for the former provision provides in relevant part:

S3–3 Discussion of Civilian Service
*   *   *   *   *   *
d. Contract service. A contract entered into directly between an individual and a Federal agency may be an appointment in the civil service. Such service is creditable only if:

(1) The individual meets all the provisions of S3–3(a) while under the contract; and

(2) Congress has given an agency the authority to appoint individuals by contract for the particular type of service involved; or

(3) OPM has specifically given an agency the authority to use a contract as an appointing instrument for the particular type of service involved. Contract service is not creditable if the contract is not an appointing instrument which meets the provisions of S3–3(a)(1). This is true even if the contract service meets the "supervision" and "Federal function" tests. Accordingly, a contract entered into directly between an organization and a Federal agency, even though it is subject to the supervision and direction of Federal officials, does not appoint the employees of the organization into the civil service. The services

effectively nullified its decision, so that any impact that the decision might have had on the future interpretation of civil service rules is eliminated. We deny this request because the Board's decision, as the Board itself recognizes, would continue to impact future claims for service credit for all pre-March 29, 1985 contract service if the new FPM Supplement is only applied prospectively.

## OPINION

█ A. OPM asserts in this appeal that the Board erred in holding respondents' contract service to be creditable for retirement and other purposes. It contends that the FPM Supplement relied on by the Board is contrary to and conflicts with 5 U.S.C. § 2105(a) (1982)[6].

Respondents, on the other hand, argue that the FPM Supplement properly recognized contract service as creditable service and that, in any event, they were appointed in the civil service as that term is used in § 2105(a).

Because of our disposition of OPM's appeal, we need not consider the issue raised in the cross appeal of respondents.

B. Section 8332 of Title 5, United States Code (1982), provides that service as an "employee" is creditable for CSRA purposes.

(a) The total service of an *employee* ... is the full years and twelfth parts thereof, excluding from the aggregate the fractional part of a month, if any.

(b) The service of an *employee* shall be credited from the date of original employment to the date of separation on which title to annuity is based in the civilian service of the Government.

(Emphasis supplied).

The term "employee" for this purpose is defined in 5 U.S.C. § 8331(1) (1982) by reference to § 2105(a) of Title 5, United States Code, which, in turn, has the following definition of employee:

(a) For the purpose of this title, "employee", except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—

(1) appointed in the civil service by one of the following [federal officials] acting in an official capacity—

\* \* \* \* \* \*

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105(a) (1982).

█ Thus, the criteria of § 2105 are applicable to one seeking to claim creditable service for retirement purposes.

All three of these test elements must be met for an individual to be a federal employee. The elements have independent significance and are strictly applied. *See*

---

of the employees of that organization are not creditable even if a Federal official interviews such employees prior to the organization hiring them. Nor does the fact that a Federal official has the authority to disapprove the selection of an individual or to require the organization to terminate an individual's services make such service creditable. (*See Costner v. United States* [665 F.2d 1016, 229 Ct.Cl. 87 (1981)], *supra, Curran v. Office of Personnel Management,* 566 F.Supp. 1511 (D.D.C. 1983)).
FPM Supp. 831-1, Subch. S3-3(d) (March 29, 1985).

**6.** OPM also takes the position that the failure of respondents to cross-appeal precludes

them from contesting the determination by the Board that they were not appointed in the civil service within the meaning of § 2105. In order to sustain the Board's decision, respondents, without appealing, can urge a position they took before the Board even though it was rejected. *See Massachusetts Mutual Life Insurance Co. v. Ludwig,* 426 U.S. 479, 480–81, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1976); *Morley Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593 (1937); *United States v. American Railway Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924).

*McCarley v. Merit Systems Protection Board,* 757 F.2d 278, 280 (Fed.Cir.1985); *Costner v. United States,* 665 F.2d 1016, 1020, 229 Ct.Cl. 87 (1981); *Baker v. United States,* 614 F.2d 263, 268, 222 Ct.Cl. 263 (1980); *National Treasury Employees Union v. Reagan,* 663 F.2d 239, 246 (D.C.Cir. 1981). In this case, the parties have stipulated that each of the respondents was engaged in the performance of a federal function and was supervised by a federal official. We need only consider, therefore, whether respondents were "appointed in the civil service."

On the specific issue of appointment, the Board determined that the CALJ's initial decision[7] had been erroneous:

> OPM and the Navy correctly point out that it is undisputed that the [respondents] clearly understood or should have understood that by accepting their positions with the unit they were not appointed to "regular civil service" positions.... Since appointment requires, at the very least, an intentional, unequivocal exercise of discretion by an appointing official to appoint an individual to a particular position, the CALJ erred in concluding that [respondents] were appointed to positions in the civil service. *See National Treasury Employees Union v. Reagan,* 663 F.2d 239, 246 n. 9 (D.C.Cir.1981).

It is well established that an appointment is necessary for a person to hold a government position and be entitled to its benefits. This has been recognized on many occasions by the Supreme Court which, in *United States v. Testan,* 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976), for example, stated:

> The established rule is that one is not entitled to the benefit of a [government]

position until he has been duly appointed to it. *United States v. McLean,* [5 Otto 750], 95 U.S. 750, 24 L.Ed. 579 (1878); *Ganse v. United States,* 376 F.2d 900, 902, 180 Ct.Cl. 183, 186 (1967).

After thoroughly reviewing the relevant authorities, the Court of Claims summarized the requirement as meaning "an individual cannot hold a government position as an officer or employee, nor receive the salary and other benefits pertaining thereto, until he or she has been appointed to that position by a person authorized to make the appointment." *Baker v. United States,* 614 F.2d at 268.

The parties differ as to the appointment requirement primarily on what actions are necessary to effectuate appointment. Respondents take the position that the decision to "hire" them by an authorized official constituted an "act of appointment" and that the documentation was "window dressing." They also contend that law does not establish the type of appointive act which must be performed, that a contract is a sufficient appointive document for this purpose, and that the Navy had authority to obtain their services by contract. The government counters that appointment has quasi-constitutional significance requiring greater formality than the common law concept of employment and that an official with appointment authority must issue a writing which unconditionally appoints the individual to a position in the civil service.

The precedents binding on this court have required that there be a significant degree of formality in the appointment process. In *Baker,* 614 F.2d at 267–68, the Court of Claims set out the Constitutional

---

7. The CALJ's decision stated:

[T]hat the [respondents] were unconditionally selected for federal positions under the Department of the Navy to perform federal functions under the supervision of federal officials is a conclusion required by a preponderance of the evidence. That decision was made at the culmination of the interviewing/hiring process and was made manifest by the commanding officer's approval of the hiring board's recommendation.

The decision was communicated to the individual prior to or at the actual signing of the contract. The appointing officer had unequivocally selected the individual for federal employment. Thus, all that was required to effect an appointment had been completed; the [respondents] thereafter entered on duty and undertook to carry out their assigned responsibilities. In fact and in law, the [respondents] had been appointed.

and statutory foundations for government positions and appointments thereto, and reviewed the Supreme Court cases as well as its own decisions on the necessity of an appointment. The court, in *Costner*, 665 F.2d at 1020, enunciated that the "totality of the circumstances" approach cannot be used to satisfy the statutory requirement, stating that "[a]n abundance of federal function and supervision will not make up for the lack of an appointment." Similarly, common law master-servant relationships do not control in determining federal employment where the statute expressly goes beyond the common law and requires more than just a supervisory relationship. In *Costner*, it was aptly noted that the common law doctrine was to distinguish between an employee and an independent contractor, whereas the federal statute is to determine "not whether plaintiff *was* an employee (he was) but *whose* employee." *Id.* at 1021. Those cases, and the authorities on which they rely, evidence that definite, unconditional action by an authorized federal official designating an individual to a specific civil service position is necessary to fulfill the appointment requirement of 5 U.S.C. § 2105(a). In this connection, decisions in the Court of Claims not infrequently have turned on whether the SF 50 or 52 had been executed by an authorized government official. *See, e.g., Costner, supra; Skalafuris v. United States*, 683 F.2d 383, 231 Ct.Cl. 173 (1982); *Goutos v. United States*, 552 F.2d 922, 212 Ct.Cl. 95 (1976). In fact, in *Goutos*, the court noted that, under the facts of the case, execution of the form was the *"sine qua non* of plaintiff's appointment." 552 F.2d at 924. *See also Costner*, 665 F.2d at 1022.

Respondents argue that *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) teaches that such solemnities as the signature on a commission are only evidence of an appointment or of the validity of the instrument. From this they say that the "act of appointment" occurred in this case when the Navy commander made his final decision to hire respondents and that the documentation is unnecessary and mere "window dressing." In support, respon-

dents also cite *National Treasury Employees Union v. Reagan, supra* (NTEU).

We do not find these arguments to be persuasive nor the cases relied on to be helpful to respondents' position. Initially, we note that it is abundantly clear in *Marbury v. Madison* that the formalities and solemnities of the appointive process for the office there involved were fully satisfied, *viz.*, the President nominated, the Senate gave its advice and consent, the commission was signed by the President and the seal was affixed by the Secretary of State. 5 U.S. (1 Cranch) at 157. At issue was the failure to deliver the commission, which was not a requirement of appointment. Similarly, in *NTEU*, there was a formality followed in the form of an unequivocal selection letter from, or with the knowledge of, an official having appointive authority, albeit the customary SF 50 or 52 was not employed as the government urged was required. Thus, the cases cited by respondents are not in conflict with decisions that require a formal writing, usually in the form of an executed SF 50 or 52, to effectuate a federal appointment. *See Goutos v. United States, supra.*

More importantly, these cases, which are principally relied on by respondents, are not supportive of the position that respondents should be treated as appointed *in the civil service.* In *Marbury*, there was an identifiable government position involved requiring both Executive and Legislative Branch action. In *NTEU*, there was no question that the individuals who received letters of their selection for employment had been selected for civil service positions.

■ In this case, we discern no error on the part of the Board in holding that respondents were not appointed in the civil service. The Board's findings, supported by the underlying testimony and documentation, demonstrate the absence of the exercise of appointive authority to select respondents for civil service positions. It found that the contracts executed by respondents, whether entered into directly with the Navy or with a proprietary corpo-

ration, expressly stated that respondents were to be "independent contractors." Further, respondents' compensation and benefits, although designed to be comparable to civil service pay and benefits, were paid and funded outside the civil service system, which was obviously inconsistent with civil service status. Thus, private insurance contracts were used to provide health insurance and retirement programs.[8] Social security taxes were withheld from salary.[9] There was also an absence of the usual indicia of civil service status, such as an executed SF 50 or 52 as an appointive document, and a general practice of not administering an oath of office. These findings are strong indications of nonappointment to federal government positions.

We must conclude, as did the Board based on the substantial evidence before it, that respondents were not appointed in the civil service within the meaning of 5 U.S.C. § 2105(a) (1982). Neither the act of the commanding officer in authorizing the engagement of their services nor the execution of agreements [10] by the parties, whether taken separately or together, are sufficiently definitive and unequivocal to constitute an act of appointment to a civil service position.

■ C. Although finding respondents were not appointed as required by 5 U.S.C. § 2105(a) (1982), the full Board nevertheless determined they were entitled to receive service credit for their varying periods of service with the unit. In reaching its decision, reliance was placed primarily on the language of the FPM Supplement, *supra*, note 4.[11] The Board set out the following standard, which is similar to that contained in the FPM Supplement:

> Thus, to be entitled to receive service credit for service pursuant to a special contract, the [respondents] must prove [14] that:
>
> (1) he or she was engaged or employed on a full-time, defined part-time or other determinable basis pursuant to a contract by a government official who was authorized to enter into such a contract and was acting within his or her official capacity;
>
> (2) such contract required the personal services of the [respondents]....

14 The burden of proof in such cases is on the applicant, here the [respondents]. [Citations omitted.]

Concomitantly, the Board expressly rejected the statutory appointment concept, stating:

> "Proof of appointment to a position covered by the civil service system is not a required element of [respondents'] case."

The Board found that its standard for creditable CRSA service (and the FPM Supplement provision) was satisfied by respondents.

8. The record does not reveal the manner or extent to which respondents' retirement contributions have been used to pay benefits or refunded.

9. During the period at issue, salaries of civil service employees were not subject to the Federal Insurance Contribution Act (Social Security). 26 U.S.C. § 3121(b)(6) (1982).

10. Respondents say that the agreements should be construed as appointive documents because the Department of Defense had authority under 50 U.S.C. § 1431. We are not directed to and do not find any delegation or authorization for use of these provisions by the commanding officer of the unit. Moreover, in view of the Comptroller General's analysis and interpretation, 32 Comp.Gen. 18, 20–21 (1952), of a predecessor statute having similar provisions and implementing executive orders that "the civil service laws ... are not laws ... that may be disregarded solely by reason of section 201 of the First War Powers Act, as amended," we do not regard § 1431 as authorizing the use of a contract as an appointive document in this case.

11. The Board also cited the case of *Jankovic v. United States*, 384 F.Supp. 1355 (D.D.C. 1974), but in *Costner v. United States*, 665 F.2d 1016, 1021 n. 20, 229 Ct.Cl. 87 (1981), the court expressly (and, in our view, properly) declined to follow *Jankovic* "[t]o the extent ... [it] can be read as not insisting on the appointment requirement...." We are bound by *Costner. See South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982) (*en banc* ).

To justify this position on contract service in the face of the statutory appointment requirement, 5 U.S.C. § 2105(a) (1982), the Board first noted that two civil service rulings granting service credit are cited in Appendix C of the FPM Supplement. It drew from them the conclusion that contract service had been regarded by OPM and its predecessor, the Civil Service Commission, as creditable for more than fifty years. These rulings, however, support neither this broad generalization by the Board nor the contract service provisions of the FPM Supplement. If anything, they tend to be contrary to the proposition for which they are cited. The rulings deal with contract surgeons and both indicate clearly that appointment authority had been formally exercised. In one, service credit was granted to contract surgeons when they were by statute brought into the military in 1916. National Defense Act of June 3, 1916, Ch. 134, § 10, 39 Stat. 166. Moreover, statutory authorization existed prior to that time for the Surgeon General of the Army to *appoint* contract surgeons in emergencies. Act of May 12, 1898, Ch. 296, § 2, 30 Stat. 406. The other ruling involved contract surgeons employed by the Department of the Interior for the Indian Health Service who, as noted in the FPM Supplement reference, had also received *letters of appointment*. FPM Supp. 831–1, App. C, n. 15. It is apparent in each of these situations there was more than a mere contract relationship involved.

The Board also presumes that Congress was "fully aware of and approved of" the recognition of contract service in the FPM Supplement when it enacted 5 U.S.C. § 2105(a) (1982). According to the Board, Congress had this knowledge because of the "length of duration" [sic] of the administrative interpretation, apparently referring to the above-mentioned rulings. It cites *Red Lion Broadcasting v. Federal Communications Commission,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969), and *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–79, 14 L.Ed.2d 179 (1965), in support.

Respondents, in seeking to buttress the Board's decision, argue that the FPM Supplement provision should be accorded the status of a regulation because it is part of the Federal Personnel Manual. They point to a description of the Manual as the "official" medium for issuing the "personnel regulations and instructions, policy statements and related material on Government-wide personnel programs, to other agencies." *See NTEU,* 663 F.2d at 243. They argue that the agency's administrative interpretation is entitled to great deference and that this is particularly so under what respondents characterize as the "informed inaction" standard, citing the *Zemel* and *Red Lion Broadcasting Co.* cases. By informed inaction, respondents apparently mean that an existing administrative interpretation has remained unchanged through successive reenacts of the underlying statute. Intervenor, the MSPB, argues similarly on the deference to be accorded the FPM Supplement provision.

We find these arguments unpersuasive and the cases relied on inapposite. Both cases involved administrative interpretations that were unchanged, i.e., not dealt with, by subsequently enacted legislation in the particular area. Here, the Congress spoke specifically by enacting a provision expressly covering the matter at issue. It defined employee for purposes of the CSRA in a manner which is inconsistent with the FPM Supplement language on contract service. Thus, even if the FPM Supplement were accorded regulation status, it has been made obsolete by the enactment of the statutory definition of employee. And the broad decision of the Board that appointment is not a required element of respondents' case cannot withstand the express appointment requirement of the statutory definition.

Intervenor makes an entirely independent argument in support of the substantive merits of its decision, which must also be rejected. Intervenor alleges that there was a version of the FPM Supplement issued on September 1, 1963 which corresponded substantially to the 1981 FPM Supplement provision on contract service

and that when Congress enacted Section 2105(a) in 1966, it intended to incorporate the definition contained in the 1963 document. The basis for this assertion is a statement in S.Rep. No. 1380, 89th Cong., 2d Sess. 47 (1966) reading:

> Subsection (a) is supplied to avoid the necessity of defining "employee" each time it appears in this title. The subsection is based on a definition worked out independently by the Civil Service Commission and the Department of Labor and in use by both for more than a decade.

According to the Intervenor, this is sufficient to conclude that Congress intended to recognize "service rendered under special contract" and did not intend the appointment requirement of § 2105(a) to be literally construed.

The argument is totally flawed. There is no indication anywhere in the legislative history that the 1963 document's definition was taken into account or for that matter known to anyone working on the legislation. Moreover, the legislative language defining employee is in direct conflict with the 1963 document's treatment of contract service. Finally, the definiton of employee prescribed in § 2105(a), unless otherwise clearly indicated, applies for all purposes of Title 5, whereas the 1963 document definition relates only to a limited part of Title 5. To say that Congress, or the Civil Service Commission and the Department of Labor, in working out a statutory definition to be broadly used throughout Title 5 must have specifically focused on the narrow provision relating to contract service for retirement benefits is simply not credible.

The statement in the Senate Report, quoted above, is at most ambiguous and it is well that we be concerned about reading too much into a detail of this type in legislative history. As expressed in the concurring opinion in *Hirschey v. Federal Energy Regulatory Commission*, 777 F.2d 1, 7 (D.C.Cir.1985) (Scalia, J. concurring):

> I frankly doubt that it is ever reasonable to assume that the details, as opposed to the broad outlines of purpose, set forth in a committee report come to the attention of, much less are approved by, the house which enacts the committee bill. [Footnote omitted.] And I think it is time for the courts to become concerned about the fact that routine deference to the detail of committee reports, and the produced, predictable expansion in that detail which routine deference has produced, are converting a system of judicial construction into a system of committee-staff prescription.

In view of the Board's express finding that respondents were not appointed in the civil service when they were engaged to work in the unit, and the substantial evidence to support that finding and the Board's erroneous conclusion that contract service, without appointment, is creditable for CRSA purposes, we must reverse the Board's decision.

REVERSED.