Loretta E. ALKALAY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–269C.

United States Court of Federal Claims.

Sept. 26, 2002.

William L. Bransford, Washington, D.C., attorney for Plaintiffs.

Hillary A. Stern, Washington, D.C., attorney for Defendant.

## OPINION

WILSON, Judge.

This civilian pay case is before the Court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the United States Court of Federal Claims (RCFC). Plaintiffs, managing attorneys employed by the Federal Aviation Administration (FAA), allege that they have been deprived of the full monetary benefit of their reclassified positions under the newly implemented FAA Core Compensation Plan (CCP). They seek back pay and a declaratory judgment that the FAA violated their right to equal protection under the law. Defendant contends that the Court lacks jurisdiction because plaintiffs have failed to establish a money-mandating basis for their claim, and the jurisdictional prerequisite of formal appointment to their positions did not take place until December 2001. For the reasons discussed below, defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## BACKGROUND

In 1995, Congress authorized the Administrator of the FAA to create a new Personnel Management System (PMS) in order to address the unique demands of the FAA's

workforce. Department of Transportation and Related Agencies Appropriations Act of 1996, Pub.L. No. 104–50 § 347, 109 Stat. 436,460 (1995) (codified as amended at 49 U.S.C. § 40122(g) (2000)). As part of its workforce reorganization, the agency instituted a new compensation plan, known as the FAA Core Compensation Plan, which made significant changes to the FAA's compensation and classification system. The CCP replaced the traditional grade/step pay level system with a system of pay bands ranging from "A" to "M," with each band being assigned a salary range based on market surveys. The agency's job series was grouped into nine different categories in order to determine the appropriate pay band levels for similar jobs. Each job category was assigned a number of career levels that define the progression from an entry-level position to a senior position. The CCP includes criteria for determining the proper career level and pay band placement for a position.

The FAA converted its employees en masse from the grade/step system to the CCP on April 23, 2000. Although the FAA established criteria for determining the appropriate pay band for each position, FAA employees were initially reassigned to new pay band positions based on their original grade/step levels. Prior to the conversion, all but two plaintiffs were classified as GS–15 employees. Therefore, with two exceptions, plaintiffs were initially placed in pay band "K" on April 23, 2000.

Subsequent to the conversion, the FAA was authorized to reevaluate the positions covered by the CCP to confirm that each position fell within the correct pay band. On May 9, 2000, the FAA Office of Human Resources issued a memorandum detailing the appointment process. (Def.'s App. at 58.) The memorandum indicated that each organization was required to provide Human Resources with approval levels for the establishment of positions in the "L" and "M" bands. *Id.* The memorandum also cautioned that "servicing HR [Human Resources] offices will return requests for personnel actions [form SF–52's] that do not have the appropriate approval level documented." *Id.* Human Resources issued another memorandum on

May 24, 2000 amending the process for establishing positions in the "L" or "M" bands. (Def.'s App. at 7.) This memorandum expressly supplemented the May 9, 2000 memo and indicated that the establishment of new positions in the "L" and "M" pay bands required the approval of line staff and the Office of Human Resources, and an assessment of budget neutrality and the availability of funds. *Id.* In September 2000, the FAA issued a Core Compensation Guide describing plan policies. According to the Guide, an appointment to a position within the "L" band requires approval from the head of the line of business or staff office, as well as concurrence from both the Office of Human Resources and the Office of Financial Services. (Def.'s App. at 66.) In addition, the Compensation Committee and the Deputy Administrator or Administrator must approve the proposed action prior to its implementation. *Id.*

Based on these memoranda, together with the Core Compensation Guide, defendant argues that a six-step approval process must be completed before an employee is eligible for promotion to a higher pay band: 1) review and approval of proposed promotions by line office management; (Def.'s App. at 3,7,66); 2) Human Resources review and approval, *Id.;* 3) assessment of budget neutrality and the availability of funds by line offices and the FAA Office of Financial Services, *Id.;* 4) approval of the FAA's Compensation Committee, *Id.;* 5) Deputy Administrator approval, *Id.* at 3, 66; and, 6) submission and processing of a Request for Personnel Action (SF–52), *Id.* at 3–4, 59.

In July 2000, the Deputy Chief Counsel of the FAA, James Whitlow, reviewed the senior management positions in the Office of the Chief Counsel and determined that seventeen of the plaintiffs' positions met the criteria for the Manager Level 3 position, qualifying them for the "M" pay band. In August 2000, he determined that thirty-one of the plaintiffs' positions met the Manager Level 2 position requirements, categorized in the "L" pay band. Mr. Whitlow recommended the reclassification of positions as soon as budget clearance was obtained. (Def.'s App. at 23–47.) The Human Resources Department

concurred on sixteen of the seventeen reclassifications to the "M" band, and twenty-three of the thirty-one proposed moves to the "L" band.

The Core Compensation Committee (CCC) initially expressed concern over the use of the "M" pay band because of possible cost implications which would run counter to the CCP's requirement of budget neutrality. The CCC ultimately concurred with the Human Resources Department decision to promote sixteen employees to the "M" band and twenty-three to the "L" band. Pursuant to the Core Compensation Guide, employees were eligible for promotional pay increases in the summer of 2000 in the amount of eight percent for each pay band or the pay band minimum for each band. (Def.'s App. at 49.)

The FAA implemented a Flexible Promotions Policy (FPP) on June 17, 2001, providing that base pay increases for promotions would range from zero to fifteen percent. (Def.'s App. at 64.) This flexibility was contemplated by the FAA's previous promotion policy, which stated that the FAA "[m]ay move toward a flexible promotion rate in the future, based on evaluation of [its pilot program's] experiences." (Def.'s App. at 14.)

On November 30, 2001, the FAA Administrator approved the plaintiffs' promotions. On December 7, 2001, the Assistant Administrator for Financial Services concurred with the proposed promotions because they met the requirement of budget neutrality.[1] Subsequently, SF–52's were submitted to the Human Resources office officially requesting the promotions of plaintiffs to the new positions, and SF–50's documenting their appointments to the new positions were issued to plaintiffs. Pursuant to the Flexible Promotions Policy, the FAA approved raises of five and ten percent for the promotions, with one exception. The promotions went into effect for the pay period beginning December 16, 2001. Plaintiffs received their first salary payments, including the pay increases, on January 8, 2002.

Plaintiffs claim that they should have been promoted into the higher paying "L" and "M" band positions when the Deputy Chief Counsel approved their promotions in the summer of 2000, and that they were improperly denied receipt of "L" and "M" pay band salaries between the summer of 2000 and December 2001, when they were effectively promoted. They seek back pay retroactive to July and August, 2000. In addition, plaintiffs allege that they were deprived of the eight and sixteen percent promotion increases to which they were allegedly entitled under the pay increase policy in effect during the summer of 2000.

## ANALYSIS

Subject matter jurisdiction is a threshold matter which must be addressed before the Court reaches the merits of the plaintiffs' claims. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the case"). When subject matter jurisdiction is challenged, the nonmoving party bears the burden of establishing the Court's jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). For purposes of RCFC 12(b), the Court must construe the plaintiffs' allegations in the light most favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, where jurisdictional facts in the complaint are challenged, the Court may resolve those facts. *Moyer v. United States,* 190 F.3d 1314 (Fed.Cir.1999).

This Court is a court of limited jurisdiction. Absent consent to entertain a claim against the United States, the Court lacks authority to grant relief. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Congressional consent to suit acts as a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Waivers of sovereign immunity must be explicit and cannot be implied. *United States v. King,* 395 U.S. 1, 2, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). The Tucker Act provides

---

1. Pursuant to the CCP, the agency cannot spend any more money under the CCP than it would have spent under the old personnel system. (Def.'s App. at 4, 52.)

that this Court has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act is purely jurisdictional and does not by itself create a substantive right of recovery against the United States. *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983). The complainant must invoke a money-mandating, substantive provision to trigger the exercise of this Court's jurisdiction pursuant to 28 U.S.C. § 1491(a). *King*, 395 U.S. at 2–3, 89 S.Ct. 1501.

■ Plaintiffs invoke the Back Pay Act, 5 U.S.C. § 5596, which entitles an agency employee who has been the subjected to an adverse personnel action to collect back pay, as one source of their substantive right to retroactive pay. However, with few express exceptions, the PMS specifically provides that Title V of the United States Code shall not apply to the FAA's new personnel plan. 49 U.S.C. § 40122(g)(2). Because the Back Pay Act is excluded from the PMS language, by virtue of its inclusion in Title V, plaintiffs may not rely upon the Act as a money-mandating statute for the purpose of Tucker Act jurisdiction.

■ Plaintiffs also rely on the FAA's Core Compensation Plan, the compensation mechanism for the new Personnel Management System, codified at 49 U.S.C. § 40122(g)(2) (2002), as a money-mandating provision triggering Tucker Act jurisdiction. Specifically, plaintiffs seek relief pursuant to the back pay provision of the Personnel Management System. However, the plain terms of the PMS back pay provision exclude plaintiffs' claim. Chapter Two of the FAA PMS Section 9(a) (Back Pay) provides:

> Agency funds may be used to pay back pay to an FAA employee or former employee who, *as the result of a decision or settlement* under the FAA Grievance Procedure, a collective bargaining agreement, the FAA Appeals Procedure, or the Executive System Appeals Procedures *is found by an appropriate authority to have been affect-*

*ed in an unjustified or unwarranted personnel action that resulted in the withdrawal, reduction, or denial of all or part of the pay, allowances, and differentials otherwise due to the employee.*

(emphasis added). Plaintiffs have not established that the FAA's alleged failure to reclassify them as of the summer of 2000 constitutes an unjustified or unwarranted personnel action within the meaning of the back pay provision. Moreover, plaintiffs do not allege entitlement to back pay based on a decision or settlement under the FAA grievance procedure, a collective bargaining agreement, the FAA appeals procedure, or other executive system appeals procedure, as the PMS expressly requires. In the absence of an express provision for an award of back pay to an employee who has allegedly been erroneously denied reclassification, the Court lacks jurisdiction over plaintiff's claim for retroactive pay based on the PMS.

## 1. Date of Appointment

■ Defendant further argues that this Court lacks jurisdiction over plaintiffs' pay claim because plaintiffs were officially appointed to their new positions only after the completion of the aforementioned six clearance procedures in December 2001. As the Supreme Court noted in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), "the established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it. (citations omitted)." *See also Goutos v. United States*, 212 Ct.Cl. 95, 98, 552 F.2d 922 (1976) (a government employee is "entitled only to the rights and salary of the position to which he has been appointed by one having the proper authority to do so.") In *Testan*, two federal attorneys contested their GS–13 classification on the ground that they were doing level GS–14 work. The Supreme Court held that this Court lacked jurisdiction to entertain their claims, noting that a "federal employee is entitled to receive only the salary of the position to which he was appointed, even though he may have performed the duties of another position or claims that he should have been placed at a higher

grade." *Testan,* 424 U.S. at 406, 96 S.Ct. 948. Therefore, even if plaintiffs' duties were properly classifiable at a particular pay level prior to December 2001, they are not entitled to receive pay at that level until they were formally appointed.

Since the dawn of the 19th century, it has been established that an appointment is "effective when the last act required by the person or body vested with the appointment power is performed." *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 156, 2 L.Ed. 60 (1803). A significant degree of formality generally inheres in the appointment process. The indicia of appointment frequently takes the form of official execution of the SF–52 (Request for Personnel Action). As this Court commented in *Goutos,* execution of the SF–52 is the "sine qua non of appointment." 212 Ct.Cl. at 98, 552 F.2d 922. In *Horner v. Acosta,* 803 F.2d 687, 693 (Fed.Cir.1986), the Federal Circuit held that "definite, unconditional action by an authorized Federal official designating an individual to a specific civil service position is necessary to fulfill the appointment requirement." The Federal Circuit further noted in *Horner* that the absence of the usual indicia of civil service status, such as an executed SF–50 or 52, were among the "strong indications of nonappointment." *Id.* at 694.

Under this criteria, Deputy Counsel Whitlow's approval of plaintiffs' reclassifications in the summer of 2000 did not effect their appointments because it was not the last act required by the person or body vested with the appointment power, and it was not unconditional. Whitlow's approval memoranda, dated July 7, 2000 and August 24, 2000, conclude with a *"propos[al]* to move the incumbents in the positions identified above into the L [or M] pay band *as soon as budget clearance is obtained."* (Def.'s App. at 22 (emphasis added).) Because budget clearance and other necessary approvals had not yet been obtained, plaintiffs' appointments had not been finalized.

Plaintiffs rely on *NTEU v. Reagan,* 663 F.2d 239 (D.C.Cir.1981), to refute defendant's argument that the completion of SF–50's constitutes proof of appointment.[2] It is true that the D.C. Circuit in *NTEU* found proof of appointment prior to the execution of SF–50's. Indeed, the D.C. Circuit characterized the SF–50 requirement for proof of appointment as a "fiction" due for retirement. *Id.* at 246. However, the circumstances of the appointments at issue in *NTEU* substantially differed from those at issue here. The plaintiffs in *NTEU* had received formal, unequivocal selection letters which were subsequently revoked by a federal hiring freeze. Plaintiffs in this case rely not on a formal selection letter as proof of appointment, but rather on a recommendation by the Deputy General Counsel that by its terms is contingent upon further clearance procedures and an assessment of budget neutrality. The conditional nature of the Deputy General Counsel's recommendation distinguishes plaintiffs' situation from that of the *NTEU* plaintiffs, "not one of ... which ... received a letter stating that he had been conditionally selected, subject to budgetary factors." *Id.* at 245.

Moreover, the CCP Guide issued prior to the Deputy General Counsel's recommendation makes clear that formal appointment required additional approval by other offices. At a minimum, the Guide and the earlier May 2000 memoranda indicate that an appointment to a position required approval from the head of the line of business or staff office, as well as concurrence from both the Office of Human Resources and the Office of Financial Services. (Def.'s App. at 65, 66.)

Plaintiffs attempt to distinguish themselves from the *Testan* plaintiffs on the ground that they are not arguing for reclassification or promotion on the basis of comparable work, but rather were denied the benefits of positions to which they had previously been appointed in the summer of 2000. In other words, plaintiffs argue that they had always been appointed to their positions; it was the pay system that changed. This ar-

**2.** The D.C. Circuit's decision in *NTEU* that members of the class were appointees did not establish their right to relief. The Court upheld the legality of President Reagan's federal hiring freeze by determining that individuals who had received unconditional selection letters were appointees, but not yet employees, with the exception of those appointees who had already reported to duty, and therefore their selection was revocable.

gument is not convincing. The transfer of plaintiffs into the new system entailed far more than a mere pay raise. After plaintiffs were converted as a group to the new system in a "holding" pay band correlative with their original status, the FAA undertook a comprehensive review of their duties and responsibilities in order to determine whether they were eligible for promotion or reclassification into an entirely new pay band. That some of the plaintiffs' duties and titles in their new positions may have been identical to their old positions does not detract from the comprehensive reclassification effort that the implementation of the new system entailed. *Testan* distinguishes between a claim brought by an employee that has been derived from the benefit of a newly appointed position and a claim of an employee that has been denied the benefit of a position to which he should have been, but was not, appointed. The record reveals that plaintiffs' claim is comparable to the latter rather than the former situation.

Finally, plaintiffs testify by affidavit that they were told by their supervisors that all necessary steps had been taken to promote them to the "L" and "M" pay bands by the summer of 2000. (Pl.'s App. at 1, 3, 7, 9.) However, the United States cannot be estopped from denying monetary benefits not otherwise permitted by law even if the claimant was given misinformation by a Government official. *OPM v. Richmond,* 496 U.S. 414, 424, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). In sum, plaintiffs have failed to cite any statutory or regulatory provisions that authorize a monetary damages remedy for their alleged improper classification. In the absence of a formal appointment to their newly classified positions, this Court lacks jurisdiction to determine the merits of plaintiffs' claims.

### 2. Post–Appointment Pay

■ Plaintiffs also seek back pay from December 2001 (the date of appointment) to date, for the difference between their current salaries and the salaries they would have received had their promotion raises not been subject to the FPP guidelines that went into effect in June 2001.[3] The parties do not dispute that plaintiffs' salaries are now within the salary ranges assigned to the "L" and "M" bands. The salary range for the "L" band is currently $94,300 to $146,200, and no plaintiff promoted to the "L" band is receiving a salary less than $94,300. Similarly, the salary range for the "M" band is currently $111,200 to $150,000, and no plaintiff promoted to the "M" band is receiving a salary less than $111,200. (Def.'s Ren. Mot. at 28.) However, plaintiffs contend that they have not received the full pay to which they are entitled because the CCP pay policy in effect at the time they argue they were appointed (during the summer of 2000) provided for promotion increases of eight to sixteen percent. Instead, plaintiffs received pay increases in the five to ten percent range prescribed by the Flexible Promotions Policy implemented in June 2001.

Plaintiffs' argument fails for the same reason underlying the Court's dismissal of their core claim for back pay dating to the summer of 2000. Because the Court, based on *Testan,* finds that plaintiffs were not formally appointed until December 2001, and therefore lacks jurisdiction to award retroactive promotional pay, it is similarly without jurisdiction to award promotion increases pursuant to a system no longer in effect by the time they were formally appointed. Plaintiffs do not identify any statute, regulation, or rule mandating their compensation at levels above the ranges assigned to their pay bands. To the contrary, under the new FPP applicable to plaintiffs' post-appointment pay, base pay increases in promotion situations may range from zero to fifteen percent. (Def.'s App. at 64.)

---

**3.** Plaintiffs contend that the FPP should not apply to them because it only relates to promotions involving a change of duties or responsibilities. They argue that their case simply involves conversions from positions already occupied. However, the FPP uses a similar definition of the term "promotion" as the CCP upon which plaintiffs rely. The FPP defines a promotion as "movement from a position in one pay band to a position in a higher pay band." (Def.'s App. at 49.) The CCP definition of promotion is "a change to a higher pay band that results from a change in job series, job responsibilities, or employee competencies, skills, or abilities." (Pl.'s App. at 21.)

## 100

### 3. Equal Protection

Finally, plaintiffs claim that the Government's refusal to pay them the full eight and sixteen percent raises received by other managers promoted to the "L" and "M" bands violated the Equal Protection Clause of the U.S. Constitution. A claimant who brings a money-mandating claim to this Court is not precluded from also raising constitutional issues. *Holley v. United States,* 124 F.3d 1462, 1465–66 (Fed.Cir.1997). However, plaintiffs have failed to articulate a money-mandating statutory basis for their suit, and therefore, are unable to state a claim under the Tucker Act. It is well-settled that the Fifth Amendment Equal Protection Clause is not a money-mandating provision, *LeBlanc v. United States,* 50 F.3d 1025, 1028 (Fed.Cir.1995), and thus, by itself, does not provide a basis for this Court's jurisdiction. Accordingly, plaintiffs' equal protection claim is dismissed for lack of subject matter jurisdiction.

### CONCLUSION

For the reasons discussed above, Defendant's 12(b)(1) motion is **GRANTED**. The Clerk of Court is directed to dismiss the case with prejudice. No costs.

**IT IS SO ORDERED.**